# IN THE UNITED STATES DISTRICT COURT
# FOR SOUTHERN DISTRICT OF FLORIDA

**CITI CARS, Inc., A Florida Corporation,**            **CASE NO:**

     **Plaintiff,**

**v.**

**COX ENTERPRISE, Inc.,**            **JURY TRIAL REQUEST**
**a Delaware Corporation,**

**COX AUTOMOTIVE, Inc.,**            **ANTI-TRUST COMPLAINT**
**A Delaware Corporation,**

**MANHEIM AUCTION, LLC,**
**A Delaware Limited Liability Corporation,**

**NEXTGEAR CAPITAL, Inc.**
**A Delaware Corporation,**

     **Defendant(s).**
_____/

## COMPLAINT

COMES NOW the Plaintiff, CITI CARS, Inc., a Florida Corporation, (hereinafter "Plaintiff" or "Citi Car") and hereby sues Cox Enterprise, Inc., a Delaware Corporation, Cox Automotive, Inc., a Delaware Corporation, Manheim Auction, LLC, a Delaware Limited Liability Corporation, and Nextgear Capital, Inc., a Delaware corporation (Collectively "Defendants") (hereinafter "Cox," "Cox Auto," "Manheim," and "Nextgear") for violations of the  Sherman Anti-Trust Act, 15 U.S.C. §§ 1 & 2, §§ 7 & 4 Clayton Act, Robinson-Patman Act, 15 U.S.C. § 13(a), U.S. Constitution ART 1, SEC 8, Cl.3, Federal Unfair Deceptive Practice Act, 15 U.S.C. § 45, and the U.S. Constitution Amendments 5 and 14 Due Process and Equal Protection clauses. In support thereof the Plaintiff would state the following:

# I.

## <u>INTRODUCTION</u>

1. Citi Cars, Inc., A Florida Corporation is a local used vehicle Retail Car Dealer, previously located at 13760 Northwest 19th Avenue, Unit 12, Opa Locka, Florida, 33054.

2. Defendants are the leading wholesale used vehicles' auto-auctioneers and financiers who have grown to control the used cars inventories and resale of used vehicles in every State of the United States as well as globally in various other countries.

3. Defendants, by combining and controlling their various corporate subsidiaries, not only control the used vehicles inventory throughout the United states, but also through price-fixing, in various forms, have substantially increased the wholesale and retail "pricing" of used vehicles, for both licensed dealers and consumers as the ultimate end users, lowered the quality of used vehicles in the flow of interstate commerce, as well as by market allocation and by inventory allocation to their auctions, by creating exclusive collusive contractual agreements with independent and franchise automotive dealerships,  which serves to eliminate competition for the purchase of used vehicles, limiting or removing the ability of Dealers to purchase used cars traded into automotive dealerships so that such vehicles can only be purchased at Defendants' auctions, which allows Defendants to fix prices and impose substantial fees upon dealers for vehicles purchased at Defendants' auctions, causing higher wholesale prices and lower quality for consumers.

4. Accordingly, the Defendants course of conduct has substantially lessened competition in the United States resulting in per-se violations of Anti-Trust Laws.

## II.

## JURISDICTION AND VENUE

5. This complaint alleges conspiracy and/or attempt to unreasonably restrain trade by way of Defendants' actions to monopolize, conspire to monopolize, and restrict and/or destroy competition, all of which are violations of anti-trust laws, including, but not limited to, Sections 1 & 2 of the Sherman Act (15 U.S.C. § 1, *et seq.),* 15 U.S.C. § 4, Section 3 of the Clayton Act (15.U.S.C.A. § 14), 28 U.S.C. § 1331, and/or Fla. Stat § 542.22.

6. Venue is proper in this Court based upon 15 U.S.C. § 22, which allows for the initiation of proceedings under the antitrust laws against a corporation(s) in any district where they are found to transact business. Defendants transact business in the jurisdictional boundaries of the United States District Court for the Southern District of Florida.

7. Defendants have perpetrated multiple violations detailed herein in the flow of interstate commerce, which serve to destroy competition for the purchase and sale of used vehicles by mandating the use of their auctions for these functions and requiring dealers to utilize their financing service to purchase their used vehicles.

## III.
## PARTIES

8. Plaintiff, Citi Cars, Inc. is a corporation organized and existing under the laws of the State of Florida and solicits business in or around Miami-Dade County and other counties within the State of Florida.

9.  Cox Enterprise, Inc., a Delaware Corporation is headquartered in Atlanta, Georgia. Their Registered Agent is Corporation Service Company, 2711 Centereville Road, Suite 400, Wilmington, DE 19808.

10. Cox Automotive, Inc., a Delaware Corporation, is headquartered in Atlanta, Georgia. Their Registered Agent is Corporation Service Company, 2711 Centereville Road, Suite 400, Wilmington, DE 19808.

11. Manheim Auction Government Services, LLC, a Delaware Limited Liability Corporation, principally located at 6205-A Peachtree Dunwood Road, Atlanta, GA 30328, are registered to conduct business in Florida, and its Registered Agent is Corporation Service Company, 1201 Hays Street, Tallahassee, Fl 32301-2525.

12. Nextgear Capital, Inc., a Delaware corporation, principally located at 6205-A Peachtree Dunwood Road, Atlanta, GA 30328, are registered to conduct business in Florida, and their Registered Agent is Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301-2525.

13. The defendant Cox Enterprise, Inc. is a privately held American conglomerate based in Atlanta, Georgia. Next Subsidiaries include; Cox communications, Cox Automotive services, Manheim Auto Auctions, Inc., Next Gear Capital, Inc., Logistic Transportation, Inc., Auto-trader, Inc., Kelly Blue Book, Inc., American Financial Corporation, Inc., and many other corporations. By its own declaration and admission, the Cox Enterprise, Inc. annual revenue was eighteen (18) Billion Dollars.

14. Cox Automotive, Inc.,  a subsidiary of Cox Enterprise, Inc., which owns Manheim Auto Auctions and Next gear Capital, Inc., in coordination with its other related corporations,

have gained   control of the used vehicles market of the wholesale used vehicles bought and sold within the United States and abroad.

15. The subsidiaries include:  Autotrader, Inc., Dealer.Com, Dealer Track, Kelly Bluebook, Manheim Auctions, Next Gear Capital, V-auto, and relationships with forty thousand (40,000) Franchise Dealers, and most major automobile manufacturers.

## IV.
## BACKGROUND

16. The substance of the Plaintiff's claim is that in the course of Federal Interstate Commerce the Defendants collectively have violated the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 & 2, §§ 7 & 4 Clayton Act, Robinson-Patman Act, 15 U.S.C. § 13(a), U.S. Constitution ART 1, SEC 8, Cl.3, Federal Unfair Deceptive Practice Act, 15 U.S.C. § 45, and the U.S. Constitution Amendments 5 and 14 Due Process and Equal Protection clauses.

17. The Plaintiff submits that the Defendants have formulated a   "single entity outlet" that represents at least an eighty-six (86%) percent market share (hereinafter "Market Power") within the definition of the   HHI (Herfindal-Hirschman Index)[1] to control the United States market for the resale of wholesale used vehicles (hereinafter the "Market"), and resale wholesale price and price-maintenance of the wholesale used vehicles in the market, plus the market allocation of used vehicles, encompassing the United States as well Europe and Asia, as a global used cars' monopoly.

18. By acquisition Cox Enterprise and its subsidiaries have been able to establish control of the wholesale resale market for used cars by "market allocation and division" and

---

[1] The Herfindal Hirschman Index is a highly-accepted measure of market concentration. United States v. Cox Enters., 2016 U.S. Dist. LEXIS 31596, *1, 2016-1 Trade Reg. Rep. (CCH) P79,479 (D.D.C. Jan. 21, 2016).

by "resale wholesale price maintenance," which is the equivalent of price fixing, and by exerting such market power to become the sole establisher for the price of wholesale used cars; by:

a. "Enhancing" the valuation of wholesale prices of the used vehicles in the resale of wholesale used vehicle market;

b. Establishing Manheim Market Report Pricing (the "MMR") to eliminate price differential in the market and controlling prices across the Market;

c. Holding wholesale prices firm;

d. Adopting a standard algorithm formula, the MMR price/valuation for computing prices of wholesale prices, but claiming instant daily report from transactions a day before their occurrence;

e. Maintaining certain price differentials between same types, qualities of the same vehicle types;

f. Establishing and adhering to minimum fees based on a price schedule set by Manheim through the MMR for each transaction;

g. Fixing, determining, and mandating credit terms by compelling used car dealers to enter into written agreements with Next Gear for financing vehicles purchased at Manheim's auctions;

h. Eliminating Franchise Automotive Dealerships (i.e. major manufacturers dealerships) (hereinafter "Franchise Dealers") advertising of price discounts of their used vehicles wholesale trade-ins inventories.

i. Manheim utilizing its Market Power to set prices for Plaintiff and similarly-situated used car dealers, based on their imposition of the MMR, as the adopted

standard formula to mandate pricing across the Market.

19. Defendants' actions have led to their utilizing their market power and exclusive relationships with Franchise Automotive Dealerships to unjustly enrich themselves and their Franchise Automotive Dealership clients by:

   a. Manheim Auto Auction, Inc. has acquired the ownership of almost all used vehicle auctions in every state of the United States, has obtained the ability to manage the distribution and allocation of used vehicles through said auctions – regionally and nationwide – to manipulate pricing and availability across the United States in the flow of interstate commerce, has the ability to control wholesale prices for used cars sold to dealers at their auctions and to the consumers as the end users thereby enabling Manheim to control market allocations and engage in price fixing across the entire wholesale used vehicles' industry beginning at the commencement of every "buying and selling bid" at their actions by utilizing MMR, has established pricing guidelines and determined the circulation of this price setting for the used vehicles' industry, has established vertical uniform price fixing and price maintenance across the Market, and has established higher values for used vehicles and replaced the previously utilized well-known standard the "blackbook";

   b. Defendants have engaged in anti-competitive written contractual agreements with Franchise Dealerships to preclude the used cars' retail businesses from competing for the allocation of wholesale used vehicles for resale from the Franchise Dealers as the Major recipients of wholesale trades, by preventing small dealers from buying wholesale used vehicles directly from Franchise

Dealers, and requiring the use of Manheim Auto Auctions and the imposition of the fees charged by the Manheim. Manheim and the Franchise Dealers exclusive agreements serve to hold used car prices firm by reducing discounts and adhering to minimum fees and price schedules under Manheim's standard formulations MMR. Upon information and belief, this price fixing is pervasive across the Market.

20. The only major competitor is ADESA auto auctions, which deal mostly with salvage vehicles.

21. Auto Nation, Inc, recently has established its own auctions in Florida to attempt to compete in the Market

22. When used car dealers purchase from the Manheim Auto Auctions the following fees are imposed: 1) a buyer fee: 2) title fee: 3) administration fee(s); 4) transportations' cost; and 5) mandatory inspection fees.

23. Thereafter, the Manheim Auto Auctions combine these purchases with Dealer Services Corporations (DCS), and Manheim Auto Financial Service (hereinafter "MAFS"). MAFS subsequently was sold or acquired by Next Gear Capital service, Inc. to finance used vehicles at Manheim auctions to used car dealers, and then charge the used car dealers multiple fees (which in the aggregate reduces dealer profits significantly). A non-exclusive list of these fees includes the following: 1) finance interest charge (.05% per diem), starting from the date of purchase; 2) title fee; 3) administrative fees; and 4) ongoing curtailment payment(s)/fees. If the used car dealer defaults on the curtailment payment, the principal amount due would increase as a result of the accrued interest, plus penalty fee, and then the new balance

would accrue as compounded interest to be paid on the next monthly installment payment.

24. Frequently Next Gear has not paid the purchase price of the vehicle to the Manheim floating the payment of the purchase price for months while claiming ownership interest and then collecting the fees detailed in Paragraph 20 *supra*.

25. Manheim and Next Gear's permanent combination for the purpose of imposing fees and increasing prices by the imposition of MMR pricing is price tampering that violates the antitrust laws.[2]

26. Furthermore, the Plaintiff avers that on multiple occasions after purchasing vehicles from a Manheim auction that Manheim would wait for an extended period (up to ten (10) months), before Manheim would obtain title to the vehicle from the seller and transfer it to NextGear.

27. According to Manheim Auction policy, if the title is not available in 30 days, the dealer can return the vehicle to the auction to terminate that transaction. Interestingly enough, every Manheim Auction has a Next Gear office inside the Auction's building.

28. However, if the purchase were to be financed by Next Gear then the finance floor plan corporation would immediately begin charging interest and various fees from the start date of purchase, but it would not pay for the purchase price to the auction for that car for weeks or months by floating the payment until it would receive the title, since the title has not been transferred by the Auction for Next Gear to become

---

[2] U.S. v United States Steel Corp., 251 U.S. 417 (1920); Sec. 7 of the Clayton act, 15 USC § 18; U.S. v. Lever Bro. Co., 216 Fed. Supp. 887 (S.D.N.Y.).

the owner.

29. Nevertheless, the Plaintiff would be charged 'interest and fees' on that vehicle from the date of auction by Manheim when Next Gear had not yet paid Manheim for the auction price of the used car, and the car's title had not been transferred from Manheim to Next Gear and surely not to the Plaintiff.

30. As a result, the Plaintiff was charged interest and fees, while Next Gear had not yet paid Manheim for the auctioned used car. As a direct result of this enforced arrangement, Next Gear uses the accrued interest and fees collected from the Plaintiff from the date of purchase to reduce its cost when it finally tenders payment for the auctioned vehicle to Manheim. Next Gear's actions breach their contract with Plaintiff, unjust enrich the Defendants, and such constitutes an unfair and a deceptive lending practice. The plaintiff has purchased one thousand, eight hundred and eighty (1,880) vehicles from Manheim Auctions to date, and a large percentage of such were financed with Next Gear.

31. Cox Automotive through combining has monopolized, conspired to monopolize, engaged in price fixing, and engaged in price tampering as an effective restraint of trade. Defendants' interference with interstate commerce by infringing upon the freedom and the right to trade and transact in the flow of commerce has substantially harmed Plaintiff and others similarly-situated to the Plaintiff by enhancement of used car prices based on the imposition of MMR at Manheim Auctions nationwide, maintenance and control of  wholesale prices of used cars, lowering the quality of such used cars sold at Manheim's wholesale auctions, and by combining such purchases with a floor plan financial scheme with Next Gear Financial services,

previously known as Manheim floor plan financial services, imposing numerous fees divided between both subsidiaries' corporations, plus accruing the interest on principal purchase price, which is compounded monthly.

32. Cox Automotive, Inc., owns Kelly Blue Book, Inc., which is the widely accepted retail vehicle pricing guideline for consumer used car retail pricing. Cox has utilized Kelly Blue Book to justify the escalation of wholesale used car prices at the Manheim Auto auctions by the imposition of MMR.[3]

33. MMR prices as used at Manheim Auto Dealers Auctions utilize the Kelly Blue Book price(s) to coordinate Defendants' claim of consumer retail price compatibility with the wholesale fixed prices for used car dealers' purchases from the Manheim Auctions.

34. The MMR's average wholesale price is computer generated (by an algorithm created by Manheim) and it is not based on the actual sales at the auctions.

35. The national circulation of the MMR is a self-serving, price-fixing scheme with the intent of: 1) wealth maximization for Franchise Dealers and 2) unjust enrichment for Manheim Auto Auctions chain, by compelling Franchise Dealers to enter into exclusive arrangements to assign their entire wholesale used vehicle portfolios to Manheim Auctions' nationwide chain for market allocations to the Nationwide Manheim auctions, which prevents the wholesale vehicles from being sold to used car dealers before said vehicles are transported to the Manheim Auctions, which results in "tacit collusive dealings arrangement" with Franchise Dealers in which the

---

[3] Manheim Auto Auctions are exclusive to the licensed dealer's attendance and not open to public.

Manheim Auctions persuade Franchise Dealers to enter into Manheim's "Manheim Major Franchise initiative," thereby restraining the trade in the flow of interstate commerce and the complete elimination of competition in the wholesale used car market.

36. The "Manheim Major Franchise initiative" of Manheim Auctions' Franchise Dealers has completely eliminated competition for the purchase of wholesale used cars where previously the used car dealers could purchase directly from Franchise Dealers, in essence eliminating used car retail  dealers' ability to compete for lower prices, and the exclusion of the auctions' buyers' fee, title fee, inspection fee, adjustment fee, and transportation cost causes higher wholesale used car prices at Manheim Auctions averaging to $2000-3000  higher prices per vehicle bought at the Manheim Auctions.

37. Cox and Cox Automotive by combining many corporations Manheim Auto Auctions, Next Gear Capital, Kelly Blue Book, Auto Trader, Inc., Dealer.com, Logistic Transportation, Inc. have set out to control the resale of the wholesale used car market to monopolize such industry and has gained absolute control by price fixing and cartelization, constituting a per se violation of antitrust laws.

38. Defendants' creation of a collusive arrangement of exclusive agreements with Franchise Dealers to obtain their used wholesale vehicles' inventory to be sold only at their auctions and establishing pricing by MMR has eliminated the used car dealers' ability to purchase such vehicles before shipment to their auctions, causing restraint of interstate commerce, as the "net effect" of costing higher wholesale price at the auctions by price fixing and numerous additional charges that ultimately the consumers pay for.  Defendants' actions serve to restrain interstate commerce by

unlawful cartelization. As their own advertisement proclaim the Defendants are the conglomerate in remarketing of used vehicles.

# V.

## STATEMENT OF FACTS

39. The Plaintiff from the inception of its Corporation in April 2006 began purchasing used wholesale vehicles by attending Manheim Auto Auctions in Fort Lauderdale, Orlando, and Lakeland, Florida.

40. In the first two years the Plaintiff only made cash inventory purchases without financing.

41. The Plaintiff also had to pay for repair(s) to such vehicles upon shipment from said auctions to Plaintiff's dealership, in addition to transportation costs, buyer fees, adjustment fees, title fees, and pre-sale inspection fees. All such fees are mandated by Manheim Auto Auctions, Inc.

42. Such transactions reduced Plaintiff's buying power by costly repair and numerous fees and curtailment payments. As a result of Plaintiff's reduced capital, Plaintiff was recommended by Manheim Auctions to finance the floor plan of his inventory purchases.  Thus, Plaintiff applied for a line of credit and was approved under the Credit-Contract (hereinafter the "Contract") (See Exhibit "A") to finance Plaintiff's inventory purchases. The Manheim floor plan financial services financed inventory purchases that were from its own Manheim auto auction sister-corporation owned by Cox Automotive, Inc., which is owned by Cox Enterprise, Inc.

43. Subsequently, Manheim floor plan financial services changed its name to Next Gear

Capital, Inc.

44. The Plaintiff's credit contract was originally approved for two hundred and fifty thousand ($250,000.00) dollars, then such was subsequently increased to five hundred thousand ($500,000.00) dollars and the rate of interest was .05% per diem, plus title fees, adjustment fees, delayed payment fees, and principle payment(s) called curtailment fees.

45. Meanwhile, the Plaintiff on numerous occasions approached Franchise Dealers in Miami, Florida, in order to purchase the used wholesale vehicles directly from the Franchise Dealers, but Plaintiff was informed that all such vehicles would be shipped to Manheim Auto Auctions.

46. The Plaintiff avers that had Plaintiff been able to make direct purchases from Franchise Dealers that the Plaintiff would have saved on the average at least $3,000 per vehicle purchased; the savings Plaintiff would experience from direct purchases is a result of by-passing the Manheim Auction's high cost of transaction per vehicle, as the Franchise Dealers would have used the Black Book's rough value for appraisal of the trade-in value of the used vehicles, in which the Franchise Dealers call this estimation the Actual Cash Value (acv), which is contrary to the Manheim Auctions whom exclusively utilize MMR for price setting, as explained in Part V *supra*, which is on the average two thousand ($2,000.00) dollars to three thousand ($3,000.00) dollars higher than the Franchise Dealers appraisal value of the used cars ACV (actual cash value) appraisal-value.

47. Nevertheless, the Plaintiff continued out of necessity making inventory purchases from Manheim Auctions and financed such inventory purchases with the Next Gear.

48. After eight years of continuous dealings with the Cox Automotive, Inc. subsidiaries, the Manheim auctions, Next gear capital finance, Inc.,  Autotrader, Inc., Dealer Track, and the Logistics Transportation, during an economic down turn in November 2016 the Plaintiff fell behind and became late in paying curtailment monthly payment to Next Gear. for two (2) weeks.

49. Prior to the date the payment was due though the Plaintiff notified Next Gear Capital Finance, Inc. of the likely scenario of going into default, but Plaintiff's numerous attempts of notification went unanswered as Next Gear Capital Finance, Inc. willfully and knowingly ignored Plaintiff's notices.

50. Consequently, on December 19, 2016, Plaintiff filed for relief under Chapter 11 of the Bankruptcy Code seeking re-organization in the Federal District Court for the Southern District of Florida, and informed the Federal Bankruptcy Court of all its creditors.

51. On December 20, 2016, while in personal conference with the Bankruptcy attorney, the representatives of Next Gear Capital Finance, Inc. arrived at Plaintiff's dealer location – without prior notice – to seize all of Plaintiff's inventory vehicles.

52. Upon the Bankruptcy Attorney's immediate contact with Next Gear Capital Finance, Inc., the Next Gear Representative abandoned the seizure and with two car-hauler trucks left the premises.

53. Thereafter, Next Gear Capital finance, Inc. informed Manheim Auto Auction Inc., Autotrader, Inc., and other connected corporations owned by Cox Automotive, Inc., that the Plaintiff filed a Chapter 11 Bankruptcy.

54. The next day the Plaintiff's account with Manheim Auto Auction, Inc. was blocked.

After days of vehement objections by Plaintiff's Bankruptcy Counsel, Manheim Auto Auction, Inc. opened the account with only $100 line of credit. Thereafter Manheim Auto Auction suspended Plaintiff's account.

55. Moreover, other subsidiaries corporations of Cox Automotive, Inc. boycotted Plaintiff by denying access their networks in order to obtain any information concerning total fees paid in the past eight (8) years, and additional information pertaining to the total amount of interest paid, plus all other fees.

56. Next Gear Capital, Inc. claimed in the Chapter 11 proceedings that it owns all the assets of the Plaintiff's Corporation including cars, trucks, equipment, engines, and every tool belonging to the Plaintiff, claiming that they invested in his company, based on the Contract.

57. Next Gear Financial Service written contractual agreement with the Plaintiff (See Exhibit "A"), inherently and expressly has made in-advance the acquisition of ALL the assets of the Plaintiff in the case of default, which is why the Defendant NextGear forced the Plaintiff into default and subsequent re-organization filings for its own inequitable profit.

58. The Defendants by monopolization, combination, price-fixing, market and inventory allocation and division have substantially eliminated the competition in the United States in violation of Sherman and Clayton acts.

59. Unless remedial measures are taken by the Court, the Department of Justice, and the Attorney General of the State of Florida elimination of actual competition will not be estopped by the Defendants.

60. Price-fixing and market control and allocation are per se violations and end users as

public consumers plus small retail dealers have faced substantial price increases in the used car wholesale prices, which carry over to retail pricing as well.

61. The quality of used cars has substantially declined because of incomplete repairs performed by Manheim Auctions prior to sale at their auction.

62. The quality of service and products have declined because of the dominance of the market by the Defendants.

**COUNT I**

**<u>VIOLATION OF ANTITRUST LAWS</u>**

63. Plaintiff incorporates by reference as if fully set forth, all the allegations in paragraphs 1 through 62 set forth above.

64. The Defendants and their co-conspirators, by and through their officers, directors, employees, agents, and other representatives, entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Antitrust Laws namely Anti-Trust Act, 15 U.S.C. §§ 1 & 2, §§ 7 & 4 Clayton Act, Robinson-Patman Act, 15 U.S.C. § 13(a).

65. Defendants, by their unlawful conspiracy, artificially fixed, raised, inflated, and maintained the market price of wholesale used cars as alleged in this Complaint in violation of Antitrust Laws namely Anti-Trust Act, 15 U.S.C. §§ 1 & 2, §§ 7 & 4 Clayton Act, Robinson-Patman Act, 15 U.S.C. § 13(a).

66. The contract, combination, or conspiracy consisted of a continuing agreement, understanding, and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and/or allocate the market for, wholesale used cars they sold in the Southern District

of Florida, and around the rest of the United States.

67. In formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

  a. "Enhancing" the valuation of wholesale prices of the used vehicles in the resale of wholesale used vehicle market;

  b. Establishing Manheim Market Report Pricing (the "MMR") to eliminate price differential in the market and controlling prices across the Market;

  c. Holding wholesale prices firm;

  d. Adopting a standard algorithm formula, the MMR price/valuation for computing prices of wholesale prices, but claiming instant daily report from transactions a day before their occurrence;

  e. Maintaining certain price differentials between same types, qualities of the same vehicle types;

  f. Establishing and adhering to minimum fees based on a price schedule set by Manheim through the MMR for each transaction;

  g.  Fixing, determining, and mandating credit terms by compelling used car dealers to enter into written agreements with Next Gear for financing vehicles purchased at Manheim's auctions;

  h.  Eliminating Franchise Dealers advertising of price discounts of their used vehicles wholesale trade-in inventories.

  i. Manheim utilizing its Market Power to set prices for Plaintiff and similarly-situated used car dealers, based on their imposition of the MMR, as the adopted

standard formula to mandate pricing across the Market.

68. As a direct result of the unlawful conduct of Defendants and their co-conspirators in furtherance of their continuing contract, combination, or conspiracy, Plaintiff and other members of the Class have been injured in their business and property in that they have paid more for used cars than they would have paid in the absence of Defendants' and their co-conspirators' price fixing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a. A declaration that the unlawful combination and conspiracy alleged in this Complaint is an unreasonable restraint of trade or commerce in violation of the Antitrust laws, namely Anti-Trust Act, 15 U.S.C. §§ 1 & 2, §§ 7 & 4 Clayton Act, Robinson-Patman Act, 15 U.S.C. § 13(a).

b. An injunction enjoining, preliminarily and permanently, Defendants from continuing the unlawful combination and conspiracy as alleged in this Complaint.

c. An award to Plaintiff damages as provided by law, and joint and several judgments in favor of Plaintiff against Defendants, and each of them in an amount to be trebled in accordance with antitrust law.

d. An award to Plaintiff for the costs of this suit (including expert fees) and reasonable attorney's fees as provided by law.

e. Interest from and after the date of the service of this Complaint at the legal rate.

f. An award for such other and further relief as the nature of the case may require or as the Court deems just, equitable, and proper.

## COUNT II

## CIVIL CONSPIRACY

69. Plaintiff repeats and realleges Paragraphs 1 through 62 above as though fully set forth herein.

70. Defendants forced Plaintiff into Chapter 11 Bankruptcy because of their control of the wholesale used car market, the financing thereof, and their unfair and deceptive trade practices in administering Defendants' auctions with the fees related thereto, and by the Defendants' practices in financing used cars purchased at the auctions and the fees and charges imposed upon Plaintiff in an intentional and willful attempt to monopolize some or all of the wholesale used car market. In doing so, there was a dangerous probability that Defendants would succeed in their attempt to achieve monopoly power in the wholesale used car market nationwide. Defendants conduct was and continues to be predatory and/or anticompetitive.

71. A substantial amount of commerce nationwide and within the jurisdiction of this Court has been affected by the attempt of Defendants to monopolize the wholesale market for used cars.

72. The conduct of Defendants has a direct, substantial, and reasonably foreseeable effect on trade or commerce within the Market.

### *Injury to Plaintiff*

73. As a direct and proximate result of the attempt of Defendants to monopolize the wholesale market for used cars, Plaintiff has been injured in its business. Plaintiff has

been deprived of the benefit of free competition in the used car market, has been forced to pay noncompetitive prices for wholesale used cars at Defendants' auctions, has been squeezed in price, has been injured by the refusal of Defendants to deal with them, and has incurred increased costs and decreased profits.

74. The attempt of Defendants to monopolize the wholesale used car Market has caused Plaintiff damages including but not limited to loss of revenue, loss of profits and increased operating costs.

### *Damages*

75. Plaintiff does not know the full extent its damages at this time but seeks recovery of threefold the damages as provided for by Anti-Trust Act, 15 U.S.C. §§ 1 & 2, §§ 7 & 4 Clayton Act, Robinson-Patman Act, 15 U.S.C. § 13(a) and such other damages are ascertained through discovery and presented at trial.

WHEREFORE, Plaintiff demands judgment against Defendants for damages, including threefold damages pursuant to 15 U.S.C. § 15, interest, prejudgment interest, reasonable attorneys' fees and costs and any farther relief this Court deems just and proper.

## COUNT III

## ABUSE OF MONOPOLY POWER

76. Plaintiff repeats and realleges paragraphs 1 through 62 as though fully set forth herein.

77. Defendants have engaged in various anticompetitive bad acts in order to maintain and/or strengthen their monopoly power over the wholesale used car market in violation of Antitrust Laws.

78. Defendants forced Plaintiff into Chapter 11 Bankruptcy in an intentional and willful attempt to maintain and/or strengthen its monopoly power over the used car Markets. The conduct of Defendants was predatory and/or anticompetitive.

79. A substantial amount of commerce nationwide and within the jurisdiction of this Court has been affected by Defendants' anticompetitive acts which served to maintain and/or strengthen its exercise of monopoly power over the wholesale used car Market. Because Defendants' actions have to a large extent been successful in forcing Plaintiff and other similarly-situated small car dealers out of the relevant markets, wholesale used cars now face an increasingly concentrated, less competitive market with higher prices and reduced quality products being provided to consumers.

80. The conduct of Defendants has a direct, substantial, and reasonably foreseeable effect on trade or commerce in the Market and within the jurisdiction of this Court.

### *Injury to Citi Car*

81. As a direct and proximate result of Defendants' anticompetitive acts as a monopoly, Citi Car-Plaintiff has been gravely injured in its business. Citi Car-Plaintiff has been deprived of the benefit of free competition in the used car market, forced to pay noncompetitive prices for vehicles at Defendants' auctions, victimized by the imposition of arbitrary costs and fees, and injured by Defendants' refusal to deal with it, all of which culminated in increased costs and decreased profits eventually resulting in Citi Car-Plaintiff having to seek Chapter 11 Bankruptcy protection.

82. The effects of Defendants' various anticompetitive acts that had the result of maintaining and/or strengthening its monopoly power over the wholesale used car market caused Citi

CarPlaintiff damages including but not limited to loss of revenue, loss of profits, and increased operating costs.

### *Damages*

83. Citi Car-Plaintiff does not know the full extent of its damages at this time but seeks recovery of threefold damages as provided for by 15 U.S.C. § 15 and such other damages that are ascertained through discovery and presented at trial.

WHEREFORE, Plaintiff demands judgment against Defendants for damages, including threefold damages, interest, prejudgment interest, reasonable attorneys' fees and costs and any further relief this Court deems just and proper.

## COUNT IV

## <u>DECEPTIVE AND UNFAIR TRADE PRACTICES</u>

84. Citi Car-Plaintiff realleges Paragraphs 1 through 62 above as if specifically set forth herein.

84. Citi Car-Plaintiff is a consumer as defined by 15 U.S.C. § 57(a)

85. Citi Car-Plaintiff engaged in trade or commerce.

86. Defendants almost exclusively control and controlled the supply of wholesale used cars entering the Market.

87. Defendants, through their control of the supply of wholesale used cars in the Market, have tremendous influence on the pricing and distribution of wholesale used cars throughout the Market. Through its subsidiaries, Cox veritably controls the Market for wholesale used cars.

88. Defendants are determined to increase their control over and/or monopolize the Market for wholesale used cars nationwide.

89. Citi Car-Plaintiff is also a seller of used cars purchased on the wholesale Market; Defendants refused to sell to or otherwise deal with Plaintiff-Citi Car when it sought relief by filing a Chapter 11 Bankruptcy.

90. Towards that end, Defendants took actions to deprive Citi Car-Plaintiff access to all of the Defendants' businesses related to the used car market, arbitrarily and/or invidiously, including, but not limited to, organizing efforts to deprive Citi Car-Plaintiff access to its records and increasing the costs for obtaining wholesale used cars to noncompetitive levels.

91. Defendants through their actions have engaged in unfair methods of competition, unconscionable acts and practices, and unfair and deceptive acts and practices in conduct of interstate commerce.

92. Defendants' aforementioned conduct in forcing Citi Car-Plaintiff into seeking Chapter 11 Bankruptcy protection and then denying Citi Car-Plaintiff access to its records is unlawful within the meaning of the Deceptive and Unfair Trade Practice Act.

93. Citi Car-Plaintiff has been aggrieved and damaged by Defendants' conduct in violation of the Deceptive and Unfair Trade Practices Act, including but not limited to loss of revenue, loss of profits and increased costs in attempting to operate, specifically in purchasing and financing used cars for resale.

94. Citi Car-Plaintiff requests that this Court enter an Order declaring that Defendants' acts and practices as alleged herein violate the Deceptive and Unfair Trade Practices Act and that judgment be entered against Defendants and in favor of Citi Car-Plaintiff for

damages, plus interest, Court costs and attorneys' fees, and for such other relief as the Court deems proper.

WHEREFORE, Plaintiff-Citi Car demands judgment against Defendants for damages, plus interest, Court costs and reasonable attorneys' fees, and for such other relief as the Court deems proper pursuant to the Unfair and Deceptive Trade Practices Act.

## COUNT V

## DECEPTIVE AND UNFAIR TRADE PRACTICES IN ATTEMPTING TO MONOPOLIZE

95. Citi Car-Plaintiff realleges Paragraphs 1 through 62 above as if specifically set forth herein.

96. This is a cause of action under the Deceptive and Unfair Trade Practices Act.

97. Citi CarPlaintiff is engaged in trade or commerce.

98. Defendants control and controlled the supply of wholesale used cars in the Market.

99. Defendants, through their control of the supply of wholesale used cars, have tremendous influence over the market for wholesale used cars nationwide and within the Jurisdiction of this Court. Through its subsidiaries, Cox controls the market for wholesale used cars.

100. Defendants are determined to increase their control over and/or strengthen their monopolistic power in the Market for wholesale used cars.

101. The actions by Defendants complained of herein include attempting to obtain monopoly power, and improperly maintaining and/or strengthening its monopolistic power over the wholesale used car market.

102. Defendants through their actions have engaged in unfair methods of competition, unconscionable acts and practices, and unfair deceptive acts and practices in interstate commerce.

103. Defendants' aforementioned conduct in misusing their market power in the wholesale used car market violates the Deceptive and Unfair Trade Practice Act, 15 U.S.C. § 45.

104. Citi Car-Plaintiff requests that this Court enter an Order declaring that Defendant's acts and practices as alleged herein violate the Deceptive and Unfair Trade Practices Act; and that judgment be entered against Defendants and in favor of Citi CarPlaintiff for damages, plus interest, Court costs and attorneys' fees, and for such other relief as the Court deems proper pursuant to 15 U.S.C. § 45.

WHEREFORE, Plaintiff-Citi Car demands judgment against Defendants for damages, Court costs and reasonable attorneys' fees, and for such other relief as the Court deems proper pursuant to 15 U.S.C. § 45.

## DEMAND FOR JURY TRIAL

105. Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

106. The Plaintiff requests that this court:

107. Adjudicate and issue a decree that these Defendants' actions are per se illegal and violate anti-trust laws under 15 U.S.C. §§ 1 through 27.

108. Enter a permanent injunction to restrain and halt the Defendants and all persons acting on their behalf from carrying their contractual agreements with various automotive Dealerships, franchise or otherwise, and combination between Manheim and NextGear.

109. Award the Plaintiff treble damages for substantial and irreparable harm.

110.    Award the Plaintiff such other and further relief as this court deems just and proper.

Dated: June 8, 2017

 Respectfully Submitted,

/s/ Martin G. McCarthy
Martin G. McCarthy, Esquire
Florida Bar No.: 0149896
Richard S. Gendler & Associates, P.A.
2155 South LeJeune Road, Suite 306
Coral Gables, Florida 33015
Telephone (305) 444-1533 / Facsimile (305) 444-1075
Primary Service Email: McCarthy@Miami-Law.com
Additional Service Email 1: Eyersel@Miami-Law.com